UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,                                 Case No. 12-cr-20733

v.                                       Hon. Matthew F. Leitman

Stevie Leon Moore,

      Defendant.

_____/

**United States' Response and Brief Opposing
the Defendant's Motion for Compassionate Release**

On three occasions between March and June of 2012, Defendant Stevie Leon Moore sold a total of 329 grams of cocaine to a confidential source working with law enforcement. Moore, a career offender, pleaded guilty to one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and was sentenced to 151 months imprisonment and 36 months of supervised release.

Only 28-years old, Moore was under two probation sentences for felony narcotics offenses at the time of this conviction and already had an extensive criminal history that included felony convictions for possession of controlled substances, distribution of controlled substances, armed robbery, and possession of

1

a firearm during the commission of a felony. (*See* PSR ¶ 31-35). 151 months imprisonment was the bottom of the sentencing guideline range. (*Id*. ¶ 59).

Moore began serving his current sentence on October 3, 2013. He now moves for compassionate release under 18 U.S.C § 3582(c)(1)(A). His motion should be denied.

Moore does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming, for the purpose of this motion, that Moore's weight has not changed significantly since 2017 and his heightened risk from Covid-19 based on obesity qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Moore is not otherwise eligible for release. Moore's offense and criminal history make him a danger to the community, precluding release under USSG § 1B1.13(2). Moreover, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release as Moore has not only been convicted of a serious offense, but is a repeat offender with a criminal history that includes a crime of violence and a prior drug dealing conviction.

Moore's alternative request – that this Court allow him to complete his remaining sentence on home confinement – should also be rejected. The Court does

not have jurisdiction to grant Moore's request. Moreover, the defendant is a poor candidate for home confinement as he still has nearly three years remaining on his sentence and has a history of probation violations and warrants. Moore resided at the proposed location at the time of his prior convictions, and there is no reason to believe he would comply with the conditions of home confinement.

The Bureau of Prisons has taken significant steps to protect all inmates, including Moore, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of September 18, 2020, this process has already resulted in at least 7,680 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 116 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845— the Court should deny Moore's motion for compassionate release.

3

## **Background**

On March 27, 2012, law enforcement conducted a controlled purchase of cocaine from Moore using a confidential source (CS). (PSR ¶ 10). The CS arranged to buy cocaine from Moore in Detroit, Michigan. Moore informed the CS where they were to meet and after arriving at the designated spot, the CS located Moore and purchased cocaine from him. (*Id.*) The CS gave law enforcement the cocaine purchased from Moore, who confirmed that the substance was cocaine and weighed approximately 29 grams. (*Id.*)

Again, on April 18, 2012, law enforcement conducted a controlled purchase of cocaine from Moore using a CS. (PSR ¶ 11). The CS arranged to meet Moore in Detroit, Michigan, met with Moore, and purchased cocaine from him. (*Id.*) The CS then gave law enforcement the cocaine purchased from Moore, who confirmed it was cocaine and weighed approximately 30 grams. (*Id.*)

Finally, on June 12, 2012, law enforcement conducted a third controlled purchase from Moore in Detroit, Michigan using the CS. (PSR ¶ 12). This time, the negotiated weight of the cocaine transaction was one kilogram of cocaine. (*Id.*) Moore told the CS where to meet, and again the CS met with and bought cocaine from Moore. (*Id.*) After the transaction was complete, officers attempted to arrest Moore. (*Id.*) Moore fled to a nearby home and was subsequently located hiding in a closet within the home. (*Id.*) While the negotiated amount of cocaine was one

kilogram, Moore actually sold 270 grams of cocaine to the CS during this transaction. (*Id.*)

Moore was charged in a four-count indictment with three counts of distribution of cocaine and one count of possession with intent to distribute cocaine, all violations of 21 U.S.C. § 841(a)(1), on November 8, 2012. (ECF No. 12). On March 13, 2013, Moore pleaded guilty, with a Rule 11 Plea Agreement, to Count 4, possession with intent to distribute cocaine. (ECF No. 22).

The parties agreed that Moore qualified as a career offender and anticipated a guideline range of 151-188 months' imprisonment. (ECF No. 22, PageID.68). The Probation Department concurred with Moore's career offender status and sentencing guideline calculation. (PSR ¶ 60).

Moore has multiple prior felony convictions. In 2003, Moore was convicted of both armed robbery and possession of firearm during the commission of a felony offense, after he and other co-offenders entered a party store brandishing a sawed-off shotgun and a handgun. (PSR ¶ 31). Inside the store, Moore and his co-offenders ordered everyone in the store to lie on the floor while they stole currency and lottery tickets. (*Id.*). During the armed robbery, an employee was also robbed at gun point and forced to surrender currency, a cell phone, identification card, and credit cards. (*Id.*). Moore pleaded guilty and was sentenced to 27 months to 10 years

imprisonment on the armed robbery and a consecutive term of 2 years imprisonment on the felony firearms count. (*Id.*). Moore was paroled in December 2007. (*Id.*).

Thereafter, on March 29, 2010, using the alias "Stevie Leon Mitchell," Moore was convicted for felony manufacturing/delivering less than 50 grams of a controlled substance (cocaine/heroin/other narcotic) and initially sentenced to 2 years probation. (PSR ¶ 32).  On June 30, 2011, a probation violation warrant was issued for the Defendant due to another felony arrest. (*Id.*). On February 24, 2012, the Defendant was convicted for felony possession of less than 25 grams of a controlled substance (cocaine/narcotic) and possession of marijuana (habitual crime 3rd offense) and sentenced to 2 years' probation. (*Id.* at ¶ 33).  One month after receiving the second probation sentence for possession of a controlled substance, Moore committed the instant offense. (*Id.*). Additionally, on June 6, 2012, while still on probation, Moore was arrested in Indiana for possession of marijuana. (*Id.* at ¶ 39). There is an outstanding warrant on that case, as well as a warrant for a probation violation for the 2010 manufacturing/delivering a controlled substance case. (*Id.* at ¶¶ 32, 39).

On July 22, 2013, Judge Marianne Battani sentenced Moore to 151 months imprisonment followed by 36 months of supervised release on Count 4.

Moore began serving his prison sentence on October 3, 2013 and is currently incarcerated at FCI Ashland. He is 35 years old, and his projected release date is July

24, 2023. Moore suffers from hypertension and purports to be obese. (ECF No. 68, PageID.330). Moore, through counsel, has moved for compassionate release, citing these medical conditions and the Covid-19 pandemic. He requests compassionate release, or in the alternative, to serve the remainder of his sentence on home confinement. (*Id.* at PageID.341).

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id*.

7

When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from

Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,680 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth

Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail

or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—have been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other

11

resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

C.   Moore's request for home confinement should be denied.

Although his motion is style as a motion for compassionate release, Moore requests, in the alternative, that the Court place him on home confinement for the remainder of his sentence. (ECF No. 68, PageID.341). But the Court lacks jurisdiction to grant this relief.

The exclusive authority to determine a prisoner's place of incarceration - including home confinement – rests with the Bureau of Prisons, not with the

sentencing court. See 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment[.]"). Such a decision "is not reviewable by any court." *Id.*; *see also United States v. Oliver*, No. 17-20489, 2020 WL 2768852 at *2-*3 (E.D.Mich. May 28, 2020) (Berg, J.) (denying defendant's request that the court place him on home confinement due to Covid-19 pandemic).

The CARES Act does not authorize courts to transfer a prisoner to home confinement for the remainder of his sentence. *See Alam*, 960 F.3d at 836 ("The CARES Act expands the power of the Bureau of Prisons to 'place a prisoner in home confinement' as an alternative to compassionate release."); *Oliver*, 2020 WL 2768852, at *2-*3 ("[T]he exclusive authority to determine a prisoner's place of incarceration – including home confinement – rests with the BOP, not with the sentencing court."); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 1527186, at *1 (E.D. Mich. Mar. 31, 2020) (Tarnow, J.) ("The Government is correct that Doshi should raise his petition with the BOP."); *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) (Tarnow, J.) ("[S]ince this Court and others have recognized that the authority to place a prisoner in home confinement is given to the Bureau of Prisons, through Attorney General delegation, the Court will solely analyze Miller's eligibility for compassionate release."). The CARES Act therefore does not alter the fact that this Court lacks jurisdiction to transfer Moore to home confinement. The Court should deny this request.

**II.    The Court should deny Moore's motion for compassionate release.**

Moore's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

14

As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

A.    Moore has met the requirement to exhaust administrative remedies.

Moore has met the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at 832–36; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Moore has satisfied the exhaustion requirement. On May 9, 2020, Moore submitted a request for compassionate release to the warden at FCI Ashland. (*See* ECF No. 61, PageID.292). While Moore immediately filed a *pro se* motion with this Court on May 18, 2020, (*see* ECF No. 58), this Court entered an order to clarify Moore's exhaustion status on June 26, 2020, requiring Moore to file a supplemental motion with information about when his request to the warden was made. (*See* ECF No. 60). On July 8, 2020, Moore filed a supplemental motion which included a copy of his initial email request on May 9, 2020, and warden's response, dated May 28, 2020. (*See* ECF No. 64). On September 16, 2020, Moore, through counsel, filed

16

another motion for compassionate release. (*See* ECF No. 68). Accordingly, more than 30 days have lapsed since the receipt of Moore's request by the warden.

    B.    <u>Moore is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.</u>

Even though Moore has satisfied the exhaustion requirement, compassionate release would be improper. Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language

17

in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Moore and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir.

18

2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Moore is 35-years old. He indicates he suffers from hypertension and obesity, having a body mass index (BMI) of 40.0. (ECF No. 68, PageID.330).  Moore's medical records confirm he has been diagnosed with hypertension. (*See* Ex. A, 2020 Medical Records). His medical records show he previously received and continues to receive regular medical treatment and monitoring. (Exs. A-D: Medical Records). Moore has only recently been prescribed medication to manage his blood pressure, as he had previously refused to enroll in any chronic care treatment and signed a treatment refusal. (*See* Ex. B, 2019 Medical Records, referencing treatment refusal in June 2019).

Notably, in May 2020, Moore's blood pressure was measured at 132/92, 138/78, and 132/86, which is considered only mildly elevated. (Ex. A, 2020 Medical Records). Medical staff continued to advise Moore to avoid high sodium food and to exercise, noting Moore "purchases a lot of salt" from the commissary. (*Id.*) Between May and September of 2020, after the filing of his initial motion seeking compassionate release, Moore missed appointments to monitor his blood pressure.

(*Id*.)  At the time of his most recent reading, in September 2020, his blood pressure had increased to 160/90. (*Id*.)

Fortunately, hypertension is often treatable, and Moore has access to care and monitoring in Bureau of Prisons. It is a condition that affects many. Indeed, it is one of several conditions that the CDC has identified as "might be at an increased risk," rather than those more serious conditions that "are at increased risk" from Covid-19. *See* CDC Risk Factors (as updated).

As to obesity, Moore's recent medical records do not contain a current weight and height measurement. Moore's last recorded weight measurement is from 2017. In 2017, he weighed 271 pounds and was measured at 5 feet 10 inches tall – a BMI of 38.9. (Ex. D, 2017 Medical Records). Assuming, for purposes of this motion, that his weight has not changed significantly since 2017, Moore is obese, which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with obesity, Moore has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

Nevertheless, Moore remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in

18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's

21

verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect. *See Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm.").

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-

19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Moore's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). In a ten year period, which included more than four years spent in prison, Moore amassed an armed robbery conviction, a firearms conviction, and three felony narcotics convictions, two involving the distribution of narcotics. As discussed above, Moore's armed robbery conviction involved threatening patrons and an employee of a party store with firearms to take money, lottery tickets, and personal property, including a cell phone and credit cards. (*See* PSR ¶ 31).

In addition to this violent conviction, Moore is a multi-convicted drug dealer who continued to sell drugs even after prior convictions. Before his conviction in this case, Moore received two sentences of probation and violated both sentences by continuing to possess and sell drugs. Such conduct demonstrates that Moore has no regard for the danger posed by drugs, not only to his buyer, but to the community at large, and no regard for court-order conditions.

Moore is not eligible for compassionate release.

**C.**     **The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Moore eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Here, the nature and circumstances of Moore's offense weigh against release. Moore was distributing a substantial amount of cocaine while under two probation sentences - one for manufacturing/delivering a controlled substance and another for possession of a controlled substance. Law enforcement recovered a total of 329

24

grams of cocaine sold by Moore to a confidential source on three separate occasions. Prior to the last controlled buy, Moore had promised to sell a kilogram of cocaine, (*see* PSR ¶ 12), suggesting that he had the ability and intent to sell far more cocaine than was ultimately recovered in this case. Despite Moore's purported remorse after his arrest, there is no reason to believe that Moore would have stopped selling cocaine after the third transaction. His arrest on June 12, 2012 is why his criminal activity ended.

Additionally, just prior to his arrest on June 12, 2012, Moore fled from police and hid in a nearby home until he was located in a closet. (PSR ¶ 12). His brazen conduct, continuing to traffic drugs while on probation and flight from police, evidences his undeterred commitment to selling drugs.

Moore's criminal history also weighs against compassionate release. Moore is a career offender with multiple prior felony convictions including drug trafficking and armed robbery involving a firearm. As the U.S. Probation noted before Moore was sentenced, the instant case involved three, separate occasions of drug trafficking, and Moore would have been described as a "career offender" after the first transaction in March 2012. (PSR ¶ 76.) The subsequent transactions in April 2012 and then June 2012 provide additional aggravation here as far as sentencing factors are concerned.

Moore is not only a repeat offender, but he is also a repeat violator of court orders with a history of probation violations and warrants.  This history further underscores his pattern of undeterred criminal behavior. At no point during his adult life has Moore shown that he can remain crime-free for any significant period of time – unless incarcerated.

Granting Moore early release would not promote respect for the law or deter future conduct. Prior to his sentence on this case, Moore had shown repeated disrespect for the law with multiple, serious felony convictions in a short period of time. Moore's four year period of incarceration, from 2003 to 2007, for the armed robbery and felony weapons charges, (PSR ¶ 31), did not remotely deter him. He continued to sell drugs, risking the life and safety of others.  Moore's sentence of 151 months imprisonment was the bottom of the sentencing range, given his criminal history and the circumstances of the charged offense.

While the United States acknowledges and commends Moore for taking advantage of the many educational opportunities offered to him in the Bureau of Prisons, his conduct in prison is not a reason to grant a reduction to this sentence. Such conduct is expected, not exceptional. If this Court were to reduce Moore's sentence because of his prison conduct, it may result in sentencing disparities among defendants with similar records.

After considering the § 3553(a) factors at sentencing, the Court found Moore's sentence of 151 months imprisonment sufficient but not greater than necessary. This remains true. A consideration of all of the applicable sentencing factors do not support a reduction of this sentence.

**III.    If the Court were to grant Moore's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Moore's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Moore's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Caitlin B. Casey*
Caitlin B. Casey
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226
(313) 226-9769
caitlin.casey@usdoj.gov

Dated: September 30, 2020

## Certificate of Service

I certify that on September 30, 2020, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system, which will send notification to all counsel of record.

*s/Caitlin B. Casey*
Caitlin B. Casey
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI  48226
(313) 226-9769
caitlin.casey@usdoj.gov